*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

V

DENNIS DAWAYNE SLAGEL II,

Defendant-Appellant.

UNPUBLISHED
July 16, 2026
11:42 AM

No. 365742
Kent Circuit Court
LC Nos. 21-007794-FC;
 21-007854-FH

Before: ACKERMAN, P.J., and REDFORD and FEENEY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions for (1) first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a); MCL 750.520b(2)(b) (victim under 13, defendant over 17); (2) second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a); MCL 750.520c(2)(b) (victim under 13, defendant over 17); and (3) fourth-degree criminal sexual conduct (CSC-IV), MCL 750.520e(1)(a) (victim between 13 and 15, defendant five or more years older). The trial court sentenced defendant to serve concurrent sentences of (1) 25 to 40 years, (2) 10 to 15 years, and (3) 13 months to 2 years in prison, respectively. Defendant is subject to mandatory sex-offender registration and lifetime electronic monitoring. We affirm.

## I. FACTS

This case arises out of defendant's sexual abuse of JR.[1] The CSC-I and CSC-II acts occurred in the period of January 1, 2015 to December 31, 2015, at a home on Straight Avenue in Grand Rapids, Michigan, while JR was under the age of 13, and defendant was over the age of 17. The act of sexual penetration for the CSC-I charge was alleged to be "oral/penile . . . ." The CSC-IV act occurred in the period of January 1, 2021 to June 2, 2021, at a home in Walker, Michigan,

---

[1] JR identifies as nonbinary and uses they/them/their pronouns. The trial court and the parties have therefore used they/them/their pronouns when referring to JR, and we will do likewise.

while JR was between the ages of 13 and 15, and defendant was more than five years older. At the times of the sexual abuse, defendant was the boyfriend of JR's mother, JS.

JR testified at trial that they could not remember whether the oral penetration occurred. But JR testified about the surrounding circumstances. When JR was in third grade, JR and defendant were alone in the living room while JS was sleeping upstairs. JR wanted a piece of candy that consisted of a sucker and a liquid that was to be squirted on the sucker. Defendant asked JR to lick the candy off his penis. JR ate some of the candy and remembered that it tasted like blue raspberry, but at trial, JR could not remember if they ate the candy off defendant's penis. JR testified that defendant habitually used candy or toys to bribe or manipulate JR to participate in sexual acts. While JR was in third grade, JR told JS about the sexual abuse by defendant, but JS did nothing to help JR. JR and JS no longer had a relationship at the time of trial.

At trial, evidence was presented that JR disclosed the oral penetration to two friends. In 2017, JR told MM about the oral penetration. MM reported JR's disclosure to school authorities, but JR then denied the abuse when questioned by a school counselor and a forensic interviewer in 2017. On June 1, 2021, JR disclosed the oral penetration to another friend, AC, in an e-mail. The e-mail chain was admitted into evidence as an exhibit by stipulation of the parties, and relevant portions of the e-mails were read into the record as the prosecutor questioned AC. JR's e-mail disclosure came after a Memorial Day 2021 family gathering at which family members, including JR's aunt SS, discussed with JR ways to get JR out of JS and defendant's home due to poor conditions in the home. Following the e-mail disclosure, AC reported the abuse to school authorities. JR was removed from JS and defendant's home and placed in the home of SS and her wife. JR was forensically interviewed in 2021 and disclosed the oral penetration. JR's statements in the 2021 forensic interview were used to impeach JR's trial testimony that they did not remember the oral penetration.

Thomas Cottrell testified as a prosecution expert in child sexual abuse dynamics and offender tactics. He provided general testimony about common behaviors of child victims of sexual abuse.

The defense theory at trial was that JR fabricated the allegations to be removed from the home because JS and defendant did not support JR's transgender status and JR wanted to live with their aunts who were members of the LGBTQ community.

Defendant was convicted and sentenced, as stated earlier. Thereafter, defendant moved for a new trial and to correct an invalid sentence, making many of the same arguments he now asserts on appeal. Following a *Ginther*[2] hearing regarding defendant's ineffective-assistance-of-counsel claims, the trial court rejected defendant's arguments and denied his motion. Defendant now appeals.

## II. ADMISSIBILITY OF EXPERT TESTIMONY

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

-2-

On appeal, defendant argues that the trial court abused its discretion by denying his motion to exclude Cottrell's expert testimony. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Defendant preserved this issue by moving to exclude Cottrell's expert testimony from trial. See *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). We review a trial court's decisions regarding the qualification of an expert and the admissibility of expert testimony for an abuse of discretion. *Id*. A court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. at 217. A "court necessarily abuses its discretion when it makes an error of law." *People v Everett*, 318 Mich App 511, 516; 899 NW2d 94 (2017).

## B. ANALYSIS

At the time of trial,[3] MRE 702 provided as follows:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"MRE 702 incorporates the standards of reliability established in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993)." *People v Muniz*, 343 Mich App 437, 443; 997 NW2d 325 (2022). "The trial court . . . acts as a gatekeeper for expert testimony and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable." *Id*. (quotation marks and citation omitted). The inquiry is flexible considering the differing kinds of experts, "and a court determining the admissibility of expert testimony may consider reliability factors pertinent to the particular type of expert testimony offered and its connection to the particular facts of the case." *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012). "The expert's opinion must be shown to be reliable, including the data underlying the expert's theories and the methodology by which the expert draws conclusions." *Muniz*, 343 Mich App at 444. "The preliminary determination of the qualification of an expert is for the trial court." *Id*. at 443.

"Michigan courts regularly admit expert testimony concerning typical and relevant symptoms of abuse, such as delayed reporting and secrecy." *Id*. See also *People v Peterson*, 450 Mich 349, 373; 537 NW2d 857 (1995), amended in part 450 Mich 1212 (1995) ("[T]he prosecution may present evidence, if relevant and helpful, to generally explain the common postincident behavior of children who are victims of sexual abuse.").

---

[3] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). This opinion relies on the version of the rules in effect at the time of trial.

In *Muniz*, 343 Mich App at 441-442, the trial court qualified Cottrell "as an expert in the behavior of child sexual-abuse victims," and he "testified generally about the reasons for sexual-assault victims' delayed, or gradual, disclosure of abuse, as well as factors related to victims' recollections of abuse and recanting reports of abuse." The defendant argued that his trial counsel was ineffective for failing to object to Cottrell's testimony. *Id.* at 441. The defendant contended "that Cottrell's testimony lacked reliability because it appeared to be based on his training and experience treating victims rather than on academic studies." *Id.* at 443. This Court stated as follows:

> As to Cottrell not specifically citing the academic journals or other sources on which he relied, our Supreme Court long has recognized that "[t]here has developed a body of knowledge and experience about the symptomatology of child abuse victimization," *People v Beckley*, 434 Mich 691, 733; 456 NW2d 391 (1990) (opinion by BRICKLEY, J.), that "serves only to define the broad range of possible physical, psychological, and emotional reactions that a child victim could potentially experience." *Id.* at 722. Our Supreme Court explained that "the purpose of allowing expert testimony in these kinds of cases is to give the jury a framework of possible alternatives for the behaviors" and "to provide sufficient background information about each individual behavior at issue which will help the jury to dispel any popular misconception commonly associated with the demonstrated reaction." *Id.* at 726. [*Muniz*, 343 Mich App at 443-444 (alteration in original).]

This Court further noted that,

> in addition to his work in treating more than 300 victims of abuse, Cottrell testified regarding his training, continuing education through conferences and training sessions, and research, all sources of his knowledge. A witness may be qualified "as an expert by knowledge, skill, experience, training, or education." MRE 702. In this case, Cottrell discussed each of these areas as the foundation of his knowledge. [*Id.* at 444.]

Although not disputing Cottrell's qualifications, the defendant in *Muniz* argued that Cottrell's opinions lacked scientific validity "and thus could not assist the jury in understanding victim behavior." *Id.* The defendant submitted an affidavit of a psychologist asserting a lack of scientific consensus or empirical research to support some of Cottrell's views. *Id.* at 445. The affidavit indicated "that research in the area had some deficits and did not fully support Cottrell's assertions regarding delayed disclosure of abuse, victims' fears about being believed or separated from their families, victims' memories, and victims' recantations." *Id.* This Court stated that the

> affidavit does not establish that the totality of Cottrell's testimony lacked reliability or admissibility. Cottrell defined the parameters of his knowledge base, which were adequate to qualify him. Defense counsel had opportunity to thoroughly cross-examine Cottrell and challenge any of his testimony but did not interrogate Cottrell about research or studies that either supported or contradicted his opinions. Defendant failed to establish any ground for doubting Cottrell's reliability. [*Id.*]

This Court further explained, " 'It has . . . long been recognized that the behavior of victims of varying kinds of trauma often appears irrational and confusing to most people; and expert testimony is admissible and appropriate to explain that behavior with no need to engage in an analysis of scientific reliability.' " *Id*., quoting *People v Spaulding*, 332 Mich App 638, 659; 957 NW2d 843 (2020). This Court reasoned as follows:

> Cottrell's testimony provided a general explanation of sexual-assault victims' behavior following an assault. Cottrell gave testimony regarding a wide range of many aspects of such behavior. His expert testimony properly gave a general explanation of "the common postincident behavior of children who are victims of sexual abuse." *Peterson*, 450 Mich at 373. [*Muniz*, 343 Mich App at 445.]

In this case, defendant argues that Cottrell's opinions "largely mirror[ed]" a "discredited" theory known as Child Sexual Abuse Accommodation Syndrome (CSAAS). Defendant notes that CSAAS is not permitted to be used to determine whether a person has been sexually abused. According to defendant, Cottrell testified about behaviors that fall within CSAAS theories, such as delayed and incremental disclosures, grooming, and recantations. We disagree.

Cottrell's testimony was not based on CSAAS. He properly offered "a general explanation of 'the common postincident behavior of children who are victims of sexual abuse.' " *Id*., quoting *Peterson*, 450 Mich at 373. At the *Daubert* hearing, Cottrell expressed his understanding that CSAAS has been misused to suggest that, if a child behaves in certain ways, then the child was sexually abused. Cottrell made clear that he would not be testifying that any behaviors constitute a syndrome that is probative of whether abuse occurred. Cottrell's testimony was properly offered to assist the jury by explaining common behaviors of child victims and dispelling common misconceptions of laypeople on that issue. *Peterson*, 450 Mich at 373; *Muniz*, 343 Mich App at 443-445.[4] This testimony was helpful in assessing the defense theory that JR was lying about the sexual abuse because of the delayed and inconsistent disclosure history.

Defendant further argues that Cottrell's opinions are unreliable because they are not based on any methodology, data, or science. Defendant asserts that Cottrell relies on his subjective beliefs and unsupported speculation about the reasons for delayed disclosures or denials of abuse. We disagree.

---

[4] Defendant relies on views expressed by Dr. Kamala London, Ph.D., who testified for defendant at the *Ginther* hearing, to argue that most laypeople overestimate the extent to which victims delay disclosure and that Cottrell's testimony reinforced common misconceptions. But this does not establish that Cottrell's testimony was unreliable. See *Muniz*, 343 Mich App at 445 ("Although defendant's affiant may disagree with several of Cottrell's assertions, his affidavit does not establish that the totality of Cottrell's testimony lacked reliability or admissibility."); *Chapin v A & L Parts, Inc*, 274 Mich App 122, 139; 732 NW2d 578 (2007) (differing expert opinions failed to establish unreliability). Cottrell generally explained common behaviors of victims, and it has long been recognized that such behaviors often appear irrational and confusing to most people. *Muniz*, 343 Mich App at 445.

Defendant is incorrect in stating that Cottrell's opinions are "unscientific and therefore unreliable . . . ." As this Court has recognized, an analysis of scientific reliability is not required to admit the type of testimony at issue. *Muniz*, 343 Mich App at 445. Further, it is well understood that, under MRE 702, expert testimony may be based on "scientific, technical, *or other specialized knowledge* . . . ." (Emphasis added.) Specialized knowledge is therefore not required to be scientific, and nonscientific specialized knowledge may be gained from experience. *Lenawee Co v Wagley*, 301 Mich App 134, 163-164; 836 NW2d 193 (2013). It follows that, in the context of nonscientific expert testimony, "the relevant reliability concerns may focus upon personal knowledge or experience." *Id*. at 163 (quotation marks and citation omitted). Cottrell's knowledge was based on his educational background, his extensive experience in providing and supervising therapy, and his continuing training, which were described by Cottrell at the *Daubert* hearing and at trial. "Cottrell defined the parameters of his knowledge base, which were adequate to qualify him." *Muniz*, 343 Mich App at 445. Defendant's reliability challenge is therefore unavailing. *Id*.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant further argues that his trial counsel was ineffective with respect to his defense theory, his stipulation or failure to object to the admission of JR's statements, his failure to object to the prosecutor's use of impeachment evidence, and his handling of expert-witness issues. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

Defendant preserved these issues by raising them in his motion for a new trial.[5] See *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Whether a defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law. *Id*. Findings of fact are reviewed for clear error, and questions of law are reviewed de novo. *Id*.

### B. ANALYSIS

"To prove that his defense counsel was not effective, the defendant must show that (1) defense counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that counsel's deficient performance prejudiced the defendant." *People v*

---

[5] Despite acknowledging that the overall ineffective-assistance issue is preserved, the prosecutor asserts that defendant failed to preserve his challenge to the reasonableness of defense counsel's strategy because defendant did not raise that issue in his motion for new trial. The prosecutor nonetheless concedes that "[d]efendant is able to support his argument with citation to the *Ginther* hearing testimony from the lower court record." As defendant notes in his reply brief, the reasonableness of the defense strategy or theory is at the heart of the issue whether defense counsel's performance was constitutionally deficient. "Furthermore, so long as the issue itself is not novel, a party is generally free to make a more sophisticated or fully developed argument on appeal than was made in the trial court." *Glasker-Davis v Auvenshine*, 333 Mich App 222, 228; 964 NW2d 809 (2020). The reasonableness of defense counsel's strategy and theory was put at issue by defendant's challenge to counsel's decisions or omissions regarding the admission of the evidence at issue. Therefore, this issue is preserved.

*Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018) (quotation marks and citation omitted). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). To establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) (quotation marks and citation omitted). A "defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel[.]" *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

## 1. DEFENSE THEORY

Defendant first asserts that defense counsel's fabrication theory was an unreasonable "all or nothing gambit" that was risky because it required counsel "to villainize a transgender teenager" when the jurors were "very pro-transgender . . . ." Defendant suggests that, in light of JR's inability to recall the oral penetration during their testimony, defense counsel should have pivoted to an alternative theory involving memory or suggestibility. Defendant argues that defense counsel assigned the defense a burden of proving a plan and fabrication. We disagree.

"Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Odom*, 276 Mich App 407, 415; 740 NW2d 557 (2007). A strong presumption of effective assistance exists regarding trial strategy. *Id*. "We will not second-guess matters of strategy or use the benefit of hindsight when assessing counsel's competence." *Id*. "A particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *People v Carll*, 322 Mich App 690, 702; 915 NW2d 387 (2018) (quotation marks and citation omitted).

Defendant has failed to overcome the presumption that his trial counsel's fabrication theory was reasonable. Relying on his extensive experience and the evidence in this case, defense counsel determined that a fabrication theory should be pursued. JR had made a similar accusation of oral penetration by defendant in 2017 but then recanted it. JR then made the accusation again in 2021 after a meeting with family members, including JR's aunts, in which there were discussions about finding a way to get JR removed from JS and defendant's home. JR's June 1, 2021 e-mail to AC included a reference to making a plan and indicated that JR would love to be removed from the home. There was also evidence that defendant and JS were not supportive of JR's gender identification and that JR had a close relationship with their aunts, who were members of the LGBTQ community. The evidence therefore provided support for a theory that JR fabricated the allegations. Also, defense counsel testified at the *Ginther* hearing that he understood the jury was sympathetic to JR in light of their transgender status and that counsel therefore had to proceed carefully in order not to come across as insensitive or a bully. Defense counsel was aware of the risks and proceeded cautiously. Defendant suggests an alternative theory premised on memory or suggestibility issues should have been asserted, but defense counsel preferred a simple defense theory and believed alternative theories would confuse the jury. There was no evidence of any adult suggestion before the initial allegations in 2017. Overall, no basis exists for this Court to

substitute its judgment for that of counsel with respect to the chosen defense theory of fabrication. See *Odom*, 276 Mich App at 415.

## 2.  THE ADMISSION OF JR'S STATEMENTS

Defendant next argues that defense counsel was ineffective in failing to object to MM's hearsay testimony regarding JR's 2017 statements to MM, indicating that defendant sexually abused JR in the form of fellatio.  We disagree.

Defendant again emphasizes that JR ultimately did not testify that the oral penetration occurred.  But defense counsel did not know at the time of MM's testimony, which was before JR's testimony, that JR would later fail to remember the oral penetration, which JR had repeatedly disclosed since June 2021.  Again, we will not "use the benefit of hindsight when assessing counsel's competence."  *Id*.  Moreover, defense counsel viewed MM's testimony as supportive of the defense theory of fabrication.  After JR disclosed the abuse to MM, and authorities became involved in 2017, JR recanted.  As defense counsel explained at the *Ginther* hearing, he believed that JR lied to MM when disclosing the abuse in 2017 as a "trial balloon" and then reconstituted the allegations in 2021.[6]  In denying defendant's motion for new trial, the trial court noted that JR's recantation of the 2017 allegation "provide[d] the defense with the rationale for allowing the testimony, and to argue that the inconsistencies made [JR] an unbelievable witness overall, particularly given the defense's overarching theme of fabrication and manipulation by [JR] . . . ." Defendant fails to establish that his counsel's performance was constitutionally deficient.

But even if defense counsel's failure to object to MM's testimony were deficient, defendant has failed to demonstrate a reasonable probability of a different outcome but for the failure to object to the admission of MM's testimony.  See *Randolph*, 502 Mich at 9.  MM's testimony was cumulative of JR's disclosure of the abuse in the e-mail to AC, and other testimony provided circumstantial corroboration of the abuse.  JR testified that defendant asked JR to lick candy off his penis and that JR remembered what the candy tasted like.  JR also testified generally about how defendant used candy or toys to bribe or manipulate JR to participate in sexual acts.  JS testified that defendant made inappropriate comments about JR's breasts and their size.  JR also underwent negative behavioral changes, including engaging in self-harm, around that time. Therefore, defendant has not shown prejudice.

Defendant further argues that defense counsel was ineffective for stipulating to admit into evidence the entire June 1, 2021 e-mail chain, including the portion in which JR disclosed the sexual abuse to AC.  We disagree.

---

[6] Defense counsel testified at the *Ginther* hearing that JR had a similar approach with MM and AC, first going to each friend in 2017 and 2021, respectively, who went to school officials with JR's statements in order to get JR out of their home and living with their aunts.  And even after the e-mails between JR and AC occurred, JR contacted MM, who JR had not spoken to for some time, to let MM know that the case was coming to court; counsel asked MM if JR mentioned the topic of a plan, and MM said it was likely.  All this tied into the defense of fabrication.

"Decisions regarding what evidence to present . . . are presumed to be matters of trial strategy," and "[w]e will not second-guess counsel on matters of trial strategy" or "assess counsel's competence with the benefit of hindsight." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008); see also *Strickland v Washington*, 466 US 668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

In this case, the e-mail chain was admitted into evidence as an exhibit by stipulation, and relevant portions were read into the record as the prosecutor questioned AC. This occurred before JR testified; therefore, it was unknown at that time that JR would fail to remember the oral penetration that JR had repeatedly disclosed since June 2021. Counsel's decisions cannot be evaluated with the benefit of hindsight. *Horn*, 279 Mich App at 39. In denying the motion for new trial, the trial court stated that "an armchair quarterback" might view defense counsel's stipulation as "egregious," but counsel's "decision becomes defensible" when viewed without the distorting effects of hindsight. The court aptly noted that JR had repeatedly disclosed the oral penetration before trial and that JR's "failure to testify directly to the penetration on the witness stand during trial was unanticipated by either side . . . ."

Moreover, defense counsel used relevant portions of the e-mails to support the defense theory of fabrication, including JR's references to the need for a plan. The trial court correctly explained this when denying defendant's motion for new trial as follows:

> [Defense counsel] pursued a strategy at trial [of] asserting that [JR] made up all of the allegations of sexual assault because of their desire to move out of the household of their mother and [defendant] and into the home of their aunts. This theory required [defense counsel] to portray [JR] as somewhat calculating rather than passive and indecisive. In that context, the email to [AC] alleging sexual abuse in the hopes that [AC] might report it to school authorities (which she did) appears relevant and necessary to the defense.

Defendant suggests that the 8:59 p.m. e-mail disclosing sexual abuse should have been excluded from the exhibit, but defense counsel needed that e-mail to connect JR's comment about a plan to the sexual-abuse allegation, as opposed to other possible plans, such as SS's suggestion of JR instigating violence. Defense counsel relied on the e-mail chain, including the language regarding a plan, during his opening statement and closing argument. The trial court correctly noted when denying a new trial that "defense counsel pointed to [JR] 'making a plan,' and referenced the e-mail multiple times in closing argument." Accordingly, defendant fails to overcome the presumption that his counsel was pursuing a sound trial strategy.

### 3. IMPEACHMENT EVIDENCE

Defendant further argues that defense counsel was ineffective for failing to object to the prosecutor's alleged improper use of JR's 2021 Children's Advocacy Center (CAC) forensic-interview statements as substantive evidence, rather than impeachment evidence. Defendant also argues that counsel was ineffective for failing to request a contemporaneous jury instruction regarding the limited use of impeachment evidence.

At trial, JR testified that they did not remember whether oral penetration occurred. After being provided a written summary of the 2021 CAC interview, JR agreed that they stated in the interview that defendant "made [JR] suck his c*** . . . ." The prosecutor then questioned JR as follows:

> *Q*. And so you were giving [the CAC interviewer] details about what had happened that time that you had to touch [defendant's] penis?
>
> *A*. Yes.
>
> *Q*. Were you telling them the truth at that time?
>
> *A*. I think so. I don't remember.

"When a witness claims not to remember making a prior inconsistent statement, [the witness] may be impeached by extrinsic evidence of that statement." *People v Jenkins*, 450 Mich 249, 256; 537 NW2d 828 (1995). "The purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement—not to prove the contents of the statement." *Id*.

Defendant argues that it was improper for the prosecutor to ask if JR was telling the truth because this was an elicitation of substantive evidence rather than impeachment evidence. Defendant says that "[t]he clear purpose of these questions was to encourage the jury to believe [JR's] CAC statement and use it as evidence to convict [defendant]." Defendant asserts that there was no strategic reason for his counsel's failure to object to this question.

The prosecutor responds that the question about whether JR was telling the truth in the CAC interview "was a proper qualifying question intended to cause the jury to disbelieve [JR's] testimony at trial that they did not remember the penetration." The prosecution notes that it did not discuss the CAC disclosure during closing argument, which the prosecution views as supporting the conclusion that the prosecution was not improperly using the impeachment testimony as substantive evidence. The prosecution further argues that, even if defense counsel performed deficiently by failing to object, defendant is unable to establish prejudice.

We believe that defendant has the better argument with respect to whether the prosecutor's question was improper. Again, "[t]he purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement—not to prove the contents of the statement." *Id*. After reviewing the written summary of the 2021 CAC interview, JR acknowledged making the statements at issue. It was therefore already established that JR had made prior inconsistent statements. By then asking JR whether they were telling the truth in the CAC interview, the prosecution essentially pivoted from proving that JR made prior inconsistent statements to proving the contents of those statements.

But we agree that, even if defense counsel performed deficiently in failing to object to the prosecutor's question, defendant is unable to establish the prejudice component of his ineffective-assistance claim. This was one question during a five-day trial, and the prosecutor did not discuss the answer later in the trial. Also, JR's answer that they did not remember was more favorable to

-10-

the defense than it was to the prosecution because it aided the defense theory of fabrication. Defense counsel testified at the *Ginther* hearing that "when [JR] was saying I don't remember, I think that was a default position because [JR] realized, in my opinion, that the fabrication, the lies were catching up with [JR]." Additionally, there was independent substantive evidence of guilt supporting the jury verdict, including JR's disclosures of the abuse to MM and AC as well as the circumstantial corroboration discussed earlier.

Moreover, immediately before jury deliberation, the trial court properly instructed the jury on the limited use of impeachment evidence. "Jurors are presumed to follow their instructions, and it is presumed that instructions cure most errors." *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). Overall, defendant has failed to demonstrate a reasonable probability of a different outcome but for defense counsel's failure to object to the prosecutor's allegedly improper question. See *Randolph*, 502 Mich at 9.

We are also not persuaded that defense counsel was ineffective for failing to request a contemporaneous limiting instruction, i.e., an instruction given immediately after the impeachment occurred rather than in the final jury instructions. A contemporaneous limiting instruction is not an absolute requirement but merely a factor to consider in determining whether a prejudicial error occurred. See *Jenkins*, 450 Mich at 263 (the lack of a contemporaneous limiting instruction reinforced the conclusion that the jury accepted a prior statement as substantive evidence); *People v Jones*, 115 Mich App 543, 548-549; 321 NW2d 723 (1982), aff'd 419 Mich 577 (1984) (no error regarding impeachment evidence occurred when the limiting instruction was given in the final jury instructions but not contemporaneously). Defendant fails to establish that defense counsel was ineffective for failing to request a contemporaneous limiting instruction.

Defendant further argues that defense counsel was ineffective for failing to object to the prosecutor's improper use of CAC interviewer Augustena Baar to impeach JR's testimony that they could not remember whether they performed fellatio on defendant. Defendant reasons that the prosecutor had already impeached JR with the CAC interview statements during JR's own testimony; therefore, it was improper for the prosecutor to use Baar to impeach JR again.[7] Defendant further argues that defense counsel was ineffective for failing to seek a contemporaneous limiting instruction regarding Baar's third-party impeachment of JR.

We believe that, "[o]nce [JR] agreed they had made inconsistent statements during the CAC interview, the prosecution was not entitled to continue impeaching [JR] through Ms. Baar." Defendant says that, "[s]ince [JR] admitted making the CAC statement, there was nothing for Ms. Baar to impeach." Defendant's argument is consistent with our Supreme Court's explanation that, "[w]hen a witness claims not to remember making a prior inconsistent statement, he may be impeached by extrinsic evidence of that statement." *Jenkins*, 450 Mich at 256. After reviewing

---

[7] Defendant notes that, although defense counsel had objected to Baar's testimony on hearsay grounds, defense counsel did not object on the ground that it was improper to continue impeaching JR through Baar.

the written summary of the CAC interview, JR admitted to making the statement disclosing the oral penetration. There was therefore no basis for further impeachment.

But we also conclude that, even if defense counsel performed deficiently in failing to object to the prosecutor's use of Baar for JR's further impeachment, defendant cannot demonstrate prejudice. Baar's relevant testimony was cumulative of JR's admission that they made the statement. Further, as noted earlier, there was independent substantive evidence of guilt. Also, a proper limiting instruction regarding impeachment evidence was given in the final jury instructions, and a contemporaneous instruction was not required. Defendant has failed to demonstrate a reasonable probability that, but for the alleged deficient performance in failing to object to further impeachment, the result of the proceeding would have been different. See *Randolph*, 502 Mich at 9.

## 4. EXPERT-WITNESS ISSUES

Defendant further argues that defense counsel was ineffective in his handling of expert witness issues. According to defendant, his counsel was ineffective for failing to investigate and present expert testimony regarding suggestibility, memory, and forensic interviewing, as well as for failing to object to Cottrell's expert testimony about memory. We disagree.

Defendant first argues that defense counsel was ineffective for failing to object to Cottrell's testimony about memory. According to defendant, memory did not fall within Cottrell's expertise. We disagree.

The trial court recognized Cottrell as an expert "in the area of child sexual abuse dynamics and offender tactics." Upon inquiry by the prosecutor about whether a hypothetical child's inability to remember certain details is inconsistent with sexual abuse, Cottrell testified:

> It's not inconsistent, but I would really want to offer the caveat that there is a difference between what's in our memory and what we have the ability to recall at any given moment. Those are two different things. What's in our memory is what is encoded in our brain. What we can recall is based on the circumstances in the moment and what we're able to access, and those are two different processes.

When asked what he meant by "circumstances in the moment," Cottrell noted that "things that can impact recall are stress, are lack of sleep, are, you know, a sense of who the audience is that they're disclosing to. All of those things can impact access to memory." Cottrell testified about how circumstances such as stress, audience, and therapy can affect memory and disclosure.

Cottrell therefore testified regarding how various circumstances may affect a child's ability to recall and disclose abuse. Defendant fails to establish that this testimony falls outside Cottrell's expertise in child sexual abuse dynamics. Child memory could reasonably be viewed as related to delayed disclosure and response to trauma, therefore falling within child sexual abuse dynamics. But even if defense counsel performed deficiently in failing to object to this part of Cottrell's testimony, defendant has failed to demonstrate a reasonable probability of a different outcome. If defense counsel had objected, then the prosecution could have conducted further voir dire of Cottrell to establish that child memory falls within his area of expertise in child sexual abuse

-12-

dynamics. Also, the defense theory in this case concerned fabrication rather than memory. Defendant fails to show a reasonable probability that an objection by defense counsel would have resulted in the exclusion of Cottrell's testimony regarding memory and that this would have affected the outcome of the proceedings. See *Randolph*, 502 Mich at 9.

Defendant further argues that defense counsel was ineffective in cross-examining Cottrell. Defendant suggests that his counsel failed to elicit testimony helpful to the defense and failed to challenge Cottrell's testimony about memory, which defendant views as scientifically incorrect. We disagree.

"Decisions regarding . . . how to question witnesses are presumed to be matters of trial strategy," and "[w]e will not second-guess counsel on matters of trial strategy" or "assess counsel's competence with the benefit of hindsight." *Horn*, 279 Mich App at 39. In cross-examining Cottrell, defense counsel elicited concessions that were helpful to the defense. With respect to his background, Cottrell admitted that: he did not have a Ph.D. in psychology or a medical degree; he had not worked as a clinician in almost 20 years; he did not collect or analyze clinical data; and he had never written any published articles, books, journals, or treatises regarding child sexual abuse or offender dynamics. He also admitted that he had no personal experience counseling nonbinary children and that he had not conducted any research on disclosures by nonbinary children. Defense counsel questioned Cottrell regarding the Michigan Forensic Interview Protocol, the possibility of an interviewer's bias, and how to avoid leading questions in a forensic interview.

Defense counsel also questioned Cottrell about an article coauthored by Dr. Kamala London, Ph.D. Cottrell agreed that a task force on which he served referenced Dr. London's article. Defense counsel questioned Cottrell about the article's finding "that when children are confronted with sex abuse allegations that they typically tell their interviewer what happened[.]" Cottrell noted that the article reviewed the research of others. Defense counsel further queried, "[I]n terms of you just acknowledging that [Dr. London] is a recognized expert in the field, do you have any reason to doubt her research in a paper that she published with the other individuals?" Cottrell answered, "I do not doubt the conclusions based on all the caveats she also offered in that article." Defense counsel elicited from Cottrell that Dr. London has a Ph.D. and is a recognized expert.

Moreover, at the *Ginther* hearing, defense counsel testified about how he used his cross-examination of Cottrell to obtain his acknowledgement of Dr. London's expertise and his recognition of her article. Defense counsel explained as follows:

[Cottrell] recognized the article. He accepted the article, and the takeaway from that was when kids are confronted about child sex abuse, they generally disclose, which tied into the theory of my case about 2017 when [JR] was confronted, [JR] denied it. And so that's how I used [Dr.] London's research through Cottrell to extract that testimony, which I thought was useful.

Additionally, defense counsel's theory was based on fabrication rather than memory issues. Any alleged flaws in Cottrell's testimony about memory did not affect the defense theory. Defense counsel testified at the *Ginther* hearing about his strategic focus on a theory of fabrication rather than memory issues. Counsel viewed JR's purported lack of memory as a default position that JR

took upon realizing that lies were catching up with them rather than a true memory problem. Overall, defendant fails to show that his counsel performed deficiently in cross-examining Cottrell.

Next, defendant argues that defense counsel was ineffective for failing to consult or present the testimony of an expert witness on memory, suggestibility, and forensic interviewing. We disagree.

"An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). Again, "[a] defendant must meet a heavy burden to overcome the presumption that counsel employed effective trial strategy." *Id*. "We will not substitute our judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence." *Id*. (quotation marks and citation omitted).

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 US at 691. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690-691. Counsel may be ineffective "for failing to consult an expert when counsel had neither the education nor the experience necessary to evaluate the evidence and make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand . . . ." *Trakhtenberg*, 493 Mich at 54 n 9 (quotation marks, emphasis, and citations omitted). Cross-examining a prosecution expert rather than calling a defense expert may be a reasonable trial strategy. *Carll*, 322 Mich App at 702-703.

Defense counsel had the education and experience necessary to evaluate the evidence and make a reasonable and informed decision whether to consult or call an expert. Counsel had over three decades of experience as a criminal defense attorney. He had "tried well over 300 cases" and possessed extensive experience in child sexual abuse cases. Counsel had multiple prior experiences cross-examining Cottrell in other cases. Defense counsel noted that, "quite frankly, having [Cottrell] on the stand, I've had jurors in the past say that they didn't understand his word style. He would just—he would just say things and it would confuse jurors." Counsel knew that some prosecutors no longer use Cottrell as an expert witness because his testimony is unconvincing and confusing to jurors. In addition to drawing on his own experiences with Cottrell, counsel obtained transcripts of other trials in which Cottrell had testified, in order to understand his anticipated testimony.

In deciding whether to consult an expert, defense counsel talked to two other experienced criminal defense lawyers. Through these conversations, defense counsel learned about Dr. London. Counsel then conducted "research about what [Dr. London] had filed with the Michigan Task Force on Child Abuse and some of the articles that she put out." Accordingly, counsel "prepped [himself] with respect to [Dr. London's] work."

As noted earlier, defense counsel used Dr. London's research when cross-examining Cottrell. Counsel testified at the *Ginther* hearing that he had extracted the information he wanted from Cottrell by using Dr. London's article while also "deescalat[ing]" Cottrell's credentials and elevating Dr. London's credentials. Counsel believed it would confuse the jury if he had presented

expert testimony on memory and suggestibility issues as alternative theories to the defense of fabrication. Counsel explained that he "did not want an expert undermining the defense that this was fabrication . . . ." Also, "prosecutors seize on that, you know, which is it, ladies and gentlemen, is it fabrication? Is it bad memory? Is it suggestibility? . . . We went with one theory, and it was supported by what I believe the evidence produced." Defense counsel opined that calling a defense expert sometimes elevates the prosecution expert in the minds of the jurors by creating "a contest of the experts," and jurors are sometimes hesitant about accepting defense theories and defense experts. In sum, defense counsel did not believe that he needed to consult or retain an expert to advance his defense theory.

Therefore, the record reflects that defense counsel performed adequate research and investigation necessary to decide whether to consult or call an expert witness. Cf. *In re Casto*, 344 Mich App 590, 614; 2 NW3d 102 (2022) ("According to counsel's own testimony, she did not consider or investigate the possibility" of obtaining an expert and was unaware of the relevant type of experts being used in cases involving child sexual abuse).

Defendant further suggests that consultation with an expert in memory, suggestibility, and forensic interviewing would have identified errors in JR's forensic interviews, yielded support for a defense based on false or suggested memories, educated counsel about CSAAS, and helped counter common misconceptions allegedly reinforced by Cottrell. As explained, however, defense counsel conducted adequate research and investigation regarding whether to consult or call an expert. Counsel reasonably concluded that an expert was not needed. Despite defense counsel's previously summarized experience and research, defendant would essentially mandate consultation of an expert to determine alternate ways to defend the case. But "the inquiry is not whether a defendant's case might conceivably have been advanced by alternate means." *People v LeBlanc*, 465 Mich 575, 582; 640 NW2d 246 (2002). As noted, counsel testified at the *Ginther* hearing about why he declined to pursue an alternative defense theory based on memory or suggestibility issues. "We will not substitute our judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence." *Payne*, 285 Mich App at 190. Defense counsel reasonably decided that an expert on memory, suggestibility, and forensic interviewing was unnecessary to the fabrication theory. A possible expert view that the CAC interview techniques were suggestive lacked relevance to the fabrication theory. As explained earlier, Cottrell's testimony was not based on CSAAS, making it unnecessary to consult an expert to counter Cottrell's testimony. Overall, defense counsel was not ineffective in his handling of expert-witness issues.

## IV. CUMULATIVE ERROR

Defendant further argues that he was denied a fair trial because of the cumulative effect of errors. We disagree.

## A. STANDARD OF REVIEW

"We review this issue to determine if the combination of alleged errors denied defendant a fair trial." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007).

## B. ANALYSIS

-15-

"The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Id*. If no errors have been established, then "there can be no cumulative effect of errors meriting reversal." *Id*.

In this case, defendant has failed to establish any prejudicial errors. As discussed earlier, defense counsel arguably erred in failing to object with respect to two impeachment issues, but any such errors were not prejudicial. Any errors that occurred were minimal and did not cause prejudice. There is no cumulative prejudicial effect that undermines confidence in the reliability of the verdict. Defendant is therefore not entitled to a new trial.

## V. SUFFICIENCY OF THE EVIDENCE; GREAT WEIGHT OF THE EVIDENCE

Defendant further argues that the prosecution presented insufficient evidence to support his CSC-I conviction; alternatively, his CSC-I conviction was against the great weight of the evidence. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

"A defendant need not take any action to preserve a challenge to the sufficiency of the evidence." *People v Williams*, 294 Mich App 461, 471; 811 NW2d 88 (2011). But, to preserve an argument that the verdict is against the great weight of the evidence, the defendant must move for a new trial on that basis. *Id*. Although defendant moved for new trial in this case, he did not argue that the verdict was against the great weight of the evidence. Therefore, as defendant concedes on appeal, his great-weight-of-the-evidence challenge is not preserved. See *id*.

"This Court reviews de novo defendant's challenge to the sufficiency of the evidence." *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "We view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime to have been proved beyond a reasonable doubt." *Id*. "In applying this standard, a court must draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Cameron*, 291 Mich App 599, 613; 806 NW2d 371 (2011) (quotation marks and citation omitted). "Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime." *People v Kenny*, 332 Mich App 394, 403; 956 NW2d 562 (2020). "[A]n appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses." *Id*.

Because defendant's great-weight-of-the-evidence issue is unpreserved, we review that issue under the plain-error standard. *Cameron*, 291 Mich App at 617. Under the plain-error standard, a defendant must show that an error occurred, it was clear or obvious, and it affected the outcome of the proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Reversal is required only if the defendant is innocent or the error seriously affected the fairness, integrity, or public reputation of the proceedings. *Id*. at 763-764.

B. ANALYSIS

In this case, defendant was charged with CSC-I for an act of "oral/penile" sexual penetration that occurred when JR was under the age of 13 and defendant was 17 years of age or older. Under MCL 750.520b(1)(a), a person is guilty of CSC-I if he or she engages in sexual penetration with another person and "[t]hat other person is under 13 years of age." MCL 750.520b(2)(b) further provides that a violation committed "by an individual 17 years of age or older against an individual less than 13 years of age" is punishable "by imprisonment for life or any term of years, but not less than 25 years." Defendant does not dispute his age or JR's age at the time of the offense. He argues only that there was insufficient evidence that the penetration occurred.

Defendant emphasizes JR's testimony that they did not remember whether the penetration occurred. But the prosecution presented evidence of JR's statements to MM and AC disclosing that the penetration occurred. Most notably, the parties stipulated to the admission of the June 1, 2021 e-mail in which JR disclosed to AC that defendant made JR perform fellatio on him when JR was in third grade.[8] This disclosure was corroborated by circumstantial evidence. Although JR testified that they did not remember whether the penetration occurred, JR testified about the surrounding circumstances. JR testified about an incident that happened at home while JR was in third grade. JR and defendant were in the living room while JS was upstairs sleeping. JR wanted a piece of candy that included a sucker and a liquid that was to be squirted onto the sucker. Defendant asked JR to lick the candy off his penis. JR remembered that JR ate some of the candy and that it tasted like blue raspberry. JR testified that defendant habitually used candy or toys to manipulate JR to participate in sexual acts. Considering all this evidence, a reasonable juror could infer that JR tasted the candy when defendant inserted his penis with the candy on it into JR's mouth.

The prosecution presented additional circumstantial corroboration regarding defendant's abuse of JR. JS testified that defendant talked about breasts "all the time in front of" JR and that he made comments a couple times about JR's breasts, including about "how big they were . . . ." JR underwent negative behavioral changes. SS described JR as going from being "a very bright like spunky kid" to "losing their spark." JR engaged in self-harm, including self-cutting, and had

---

[8] Without citing authority or providing elaboration, defendant asserts that JR's statements were inadmissible because no hearsay exception applied. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Defendant has not properly presented this aspect of his argument. *Id*. But even if the argument were properly presented, defendant's stipulation to the admission of the June 1, 2021 e-mails waived any claim of evidentiary error with respect to that evidence, thereby eliminating any error. See *In re Guardianship of Gordon*, 337 Mich App 316, 320 n 4; 975 NW2d 114 (2021) ("By agreeing to the admission of evidence, a party waives a claim of error regarding the admission of the stipulated evidence on appeal."). Although defendant raises an ineffective-assistance argument challenging his counsel's decision to stipulate to the admission of the e-mails, that argument is unavailing for the reasons explained earlier.

-17-

suicidal ideations. JR and JS both testified that they no longer had a relationship with each other. JR did not want a relationship with JS because, while in third grade, JR told JS about the sexual abuse by defendant, and JS did nothing to help JR. Cottrell testified that an inability to remember certain details is not inconsistent with sexual abuse, that a child victim does not always disclose the abuse in the same way each time, and that a reported lack of memory may be used unconsciously to avoid discussing a painful event.

Accordingly, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the elements of CSC-I were proven beyond a reasonable doubt. See *Meissner*, 294 Mich App at 452. Therefore, defendant's challenge to the sufficiency of the evidence fails.

Defendant's great-weight-of-the-evidence argument is likewise unavailing. "The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Musser*, 259 Mich App 215, 218-219; 673 NW2d 800 (2003).

> [C]onflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial. Unless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination. [*People v Anderson*, 322 Mich App 622, 632; 912 NW2d 607 (2018) (quotation marks and citation omitted).]

Also, "it is the province of the jury to determine questions of fact and assess the credibility of witnesses." *Id*. (quotation marks and citation omitted). Defendant's great-weight argument consists of only a few sentences. He asserts that the prosecutor's case rested entirely on one e-mail that failed to refresh JR's memory. But the parties stipulated to admit the e-mail, which contained JR's statement that the penetration occurred, and other evidence provided circumstantial corroboration. The evidence did not preponderate so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. Accordingly, defendant's great-weight challenge fails.

## VI. SENTENCING ISSUES

Defendant further argues that mandatory lifetime registration under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*., as amended by 2020 PA 295, effective March 24, 2021, and lifetime electronic monitoring (LEM), as required by MCL 750.520b(2)(d), are cruel or unusual punishment in violation of the state and federal constitutions. He further argues that LEM is an unreasonable search in contravention of the state and federal constitutions. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

"We review issues of constitutional law de novo." *People v Benton*, 294 Mich App 191, 203; 817 NW2d 599 (2011). "Statutes are presumed to be constitutional, and the party challenging

the statute has the burden of showing to the contrary." *People v Lymon*, 515 Mich 145, 159; 29 NW3d 58 (2024).

## B. ANALYSIS

"The Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16, whereas the United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII." *Benton*, 294 Mich App at 204. "If a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *Id*. (quotation marks and citation omitted). "[U]nder the Michigan Constitution, the prohibition against cruel or unusual punishment include[s] a prohibition on grossly disproportionate sentences." *Id*. When determining whether a penalty may be considered cruel or unusual, a reviewing court should consider the following: "(1) the severity of the sentence imposed and the gravity of the offense, (2) a comparison of the penalty to penalties for other crimes under Michigan law, and (3) a comparison between Michigan's penalty and penalties imposed for the same offense in other states." *Id*. A fourth factor is "whether the penalty imposed advances the goal of rehabilitation." *Lymon*, 515 Mich at 183.

Recently, in *People v Kardasz*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket No. 165008); slip op at 33, our Supreme Court "conclude[d] that the 2021 SORA constitutes punishment." Our Supreme Court further held that the 2021 SORA is not unconstitutionally cruel or unusual punishment on its face or as applied to the defendant, who, like defendant here, was convicted of CSC-I and was therefore required to comply with SORA for life. *Id*. at ___; slip op at 2-3, 34, 42. The defendant's facial and as-applied challenges raised under the Michigan Constitution failed, and "[b]ecause Michigan's Constitution offers broader protections than the federal Constitution when assessing the proportionality of criminal punishment, it follows that defendant's federal claims must also fail." *Id*. at ___; slip op at 42. In this case, defendant argues that the 2021 SORA is unconstitutional on its face because it constitutes cruel or unusual punishment. In light of our Supreme Court's recent holding in *Kardasz*, defendant's constitutional challenge must be rejected.

Defendant further argues that LEM is unconstitutionally cruel or unusual punishment and that it is an unreasonable search in violation of US Const, Am IV, and Const 1963, art 1, § 11. But these arguments were rejected by this Court in *People v Hallak*, 310 Mich App 555, 571-581; 873 NW2d 811 (2015), rev'd in part on other grounds 499 Mich 879 (2016). This Court held that LEM did not violate the "defendant's state or federal rights against cruel and/or unusual punishment." *Id*. at 577. This Court further held that LEM for a defendant 17 years of age or older convicted of CSC-II involving a minor under the age of 13 was not an unreasonable search. *Id*. at 579. Therefore, defendant's constitutional challenges to LEM fail.

Affirmed.

/s/ Matthew S. Ackerman
/s/ James Robert Redford
/s/ Kathleen A. Feeney